IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

**FRANK G. HUDSON**,

    Petitioner,

  v.

**BRAD CAIN**,

    Respondent.

Case No. 2:20-cv-00172-IM

**OPINION AND ORDER**

**IMMERGUT, District Judge.**

  Petitioner Frank G. Hudson ("Hudson"), an individual in custody at Snake River Correctional Institution, brings this habeas corpus proceeding pursuant to 28 U.S.C. § 2254 ("Section 2254") challenging his 2008 convictions for murder, aggravated murder, and abuse of a corpse. Because the state-court decisions denying Hudson's claims are entitled to deference, the Amended Petition for Writ of Habeas Corpus (ECF No. 32) must be denied.

///

PAGE 1 – OPINION AND ORDER

## BACKGROUND

### I.    Trial Court Proceedings

On November 15, 2006, a Multnomah County grand jury returned an indictment charging Hudson with six counts of Aggravated Murder and two counts each of Murder and Abuse of Corpse in the First Degree. (Resp't Exs. (ECF No. 19), Ex. 102 at 1-2.[1]) The Oregon Court of Appeals detailed the circumstances of Hudson's arrest and subsequent charges, as follows:

> On a Sunday morning in November 2006,[2] Washington County law enforcement received reports of a potential homicide scene on Highway 26. Upon arriving at the scene officers found two male bodies in a driveway about 20 feet off the highway. One of the bodies had been dismembered and was missing its limbs and lower torso; must of the skin had also been removed from the upper torso. The other body had not been dismembered but appeared to law enforcement to have been dragged to the location where it was found. An identification card found on the latter victim identified him as David Copeland [("Copeland")]. A medical examiner at the scene determined that the victims had been shot, stabbed, and also subjected to blunt force trauma. Based on the lack of blood and the position of the bodies, law enforcement believed that the homicides had been committed elsewhere and the bodies dumped. Officers also located other evidence, mostly items of clothing, which appeared to have been thrown from a moving vehicle headed east toward Portland on Highway 26.[3]
>
> Based on the identification of Copeland, detectives contacted his ex-wife in Astoria. She, in turn, directed them to [Larry] Littrell, who had been Copeland's close friend. Littrell informed officers that Copeland had rented a room from a man named Francis and that there was another roommate—a 62-year-old man named Frank—who lived with Copeland and Francis and with

---

[1] When citing Respondent's Exhibits, the Court refers to the exhibit page numbers located in the lower right corner of each exhibit.

[2] The relevant events occurred over the weekend of Friday, November 3, to Sunday, November 5, 2006. (*See* Resp't Ex. 102.)

[3] The evidence recovered from the side of Highway 26 included a kitchen towel, rubber gloves, a light blue washcloth, boxer shorts, a paper towel, and blue jeans. (Tr. of State Ct. Proceedings (ECF Nos. 23-25) ("Tr.") at 2523-26, 2540-41, 2546-49.) A spent .38-caliber bullet bearing Weber's blood was in the pocket of the blue jeans. (Tr. at 2686-87, 3422, 3511-12.) Law enforcement later discovered that the spent bullet recovered from clothing strewn along Highway 26 bore the same markings as the bullets recovered from Weber and Copeland's bodies, indicating that all three were fired from the same gun. (Tr. at 3421-22, 3481-82.)

whom Copeland did not get along. According to Littrell, Francis owned a maroon van. Littrell drove detectives to a particular address on 62nd Street in Portland and identified it as the house where Copeland, Francis, and Frank lived. The maroon van was not in the driveway, and only a dim light could be seen coming from the kitchen.

Two Washington County detectives stationed themselves in a police car directly across the street from the house. Although it was not a marked police car, it had indicia of being a law enforcement vehicle, including a spotlight and the fact that two officers were sitting in the car using a cell phone and a laptop. The detectives were able to learn through computer research that the owner of the house was Francis Weber [("Weber")]. They obtained Weber's driver's license photo and thereby identified Weber as the dismembered homicide victim. Given all the information they had, officers believed that the residence would contain evidence relating to the murders and, in fact, might well be the location where the victims were killed.

While detectives were watching the house, it was dark, windy, and raining hard. After they had been stationed in front of the house for some time, a person walked by the police car and attracted the officers' attention. The individual, who had a slender build and wore a black hooded sweatshirt, did not look at the officers as he passed the police car. Although they could not see his face, based on his gait, demeanor, and build, the individual appeared to the officers to be in his thirties or forties, unlike the 62-year-old roommate identified by Littrell. The detectives momentarily lost sight of the person as he approached the house, but immediately thereafter lights were turned on upstairs and a television set appeared to have been turned on. It also appeared to the detectives that the person was moving about inside the house.

Officers from the Portland Police Bureau arrived and, while the person was inside the house, positioned themselves in locations around the house to ensure that no one else could enter or leave it without being seen. In addition, police set up a command post and officers gathered in a community center nearby. At that point, officers were aware that two of the three residents of the house had apparently been murdered, that the whereabouts of the third resident were unknown, and that a person who did not appear to be the third resident was inside the house.

Believing that there was evidence relating to the murders inside the house and concerned that that evidence was being destroyed and that the third resident might be dead or injured inside, officers determined that they needed to attempt to contact the person inside the house. However, given the brutal violence of the murders, they agreed that it would be unsafe to send officers to the door to attempt the contact. Police investigators had gathered information about telephone numbers that were associated with the house and, at about 11 p.m., a detective called the first of those numbers. Although the telephone rang for some time, the call went unanswered. The result was the same when a detective called the second number: Although the telephone rang for some time, no one answered the call. A

call to the third number associated with the house was answered by a man who identified himself as Sproul. He informed the detective who called him that he used to live at the house but had moved away.

Concerned that calls to the house had gone unanswered, officers decided that an officer, Defrain, would attempt to contact the person inside the house by performing a "loud hail" over the public address system in a police car. At the same time a detective, Steed, was assigned to begin an application for a search warrant which police were concerned would take some time to obtain. Steed went downtown to begin work on the warrant affidavit. At approximately 11:45 p.m., Defrain gave the hail which was repeated over a period of several minutes: "The occupants of 6738 SE 62nd, this is Portland Police. We need you to come to the front door with your hands up." Defrain observed the person inside the house put his head out of an upstairs window and then go back inside the house. Over the next minute and 20 seconds, Defrain repeated the hail in different ways and added statements indicating that he had seen the person inside the house. During that time, the person again opened and closed the window.

Ultimately, the person, later identified as [Hudson], opened the front door. Ignoring Defrain's continued instruction to keep his hands up and walk towards police, he instead reached into his pockets and turned back and fumbled with the front door of the house. Eventually, [Hudson] turned from the door and walked toward the officers with his hands up. As [Hudson] walked toward him, Defrain observed and alerted officers around him to a bloodstain on [Hudson]'s pants.

At 11:54 p.m., after he walked to Defrain as directed, officers placed handcuffs on [Hudson]. In a casual conversational style, Defrain asked [Hudson] his name and [Hudson] identified himself as "Frank" and asked what was going on. Defrain informed [Hudson] that he was not under arrest, but detectives needed to speak with him. [Hudson] informed Defrain that he had two roommates, but that there was no one else in the house at that time. [Hudson] also explained, in response to an inquiry by Defrain regarding what he had done at the front door of the house, that he had gone back to lock the door because "Francis would kill him if he did not lock up the house." [Hudson] was then asked if he would sit in the patrol car to get out of the rain while waiting for detectives to speak with him and [Hudson] responded that he would not mind doing so. He was then placed inside a patrol car while still wearing handcuffs. Officers then performed a safety check of the house. No observations of any evidence were made at that time, but they were able to confirm that there was no one else inside.

At the same time, another group of police officers had been unsuccessfully searching the area for the maroon van. While heading toward a fast food restaurant for a late dinner at about 12:05 a.m., they happened to drive by a maroon van parked about one mile from the 62nd Street house. They stopped and looked through the windows of the van, observed what appeared to be human remains inside, and immediately notified the lead investigators regarding their discovery.

PAGE 4 – OPINION AND ORDER

Just before 12:30 a.m., after the discovery of the maroon van and while it was still raining heavily, the detectives assigned to speak with [Hudson] arrived in front of the 62nd Street house in a police van. The officers, who were in plain clothes and not showing any weapons, instructed [Hudson] to step out of the police car, took him to the police van, and removed the handcuffs. Inside the police van (which, instead of having passenger seats, was configured with a table and chairs in the back), officers told [Hudson] that they would like to speak with him. [Hudson] agreed to speak with the officers, and they told him that they were investigating the disappearance of his housemates and were concerned about possible foul play. They then asked for his consent to search the house. He agreed, indicated that he had no questions about the consent form the officers presented to him, and signed it. After doing so, [Hudson] asked if he needed an attorney. One of the detectives responded, "That is up to you." The officer then immediately proceeded to read [Hudson] his *Miranda* rights. After providing [Hudson] with those warnings, the detective asked [Hudson] if he understood his rights, and [Hudson] stated that he did and also signed an advice of rights form. [Hudson] then agreed to speak with detectives.

During his conversation with detectives, [Hudson] appeared to be concerned about his roommates. He gave detectives information about them and their living situation, informing them that he had last seen Weber the previous Friday and that Weber had a "purple-ish red" van that [Hudson] had driven three or four months before. Detectives asked if Weber had any enemies who might want to injure him, and asked [Hudson] for his pants size and about his activities on Sunday. [Hudson], in response, told them a couple of stories about Weber's possible enemies, gave them a pants size, and stated that he had been stacking wood on Saturday and had, on Sunday, faxed a time sheet to his employer. He also agreed to allow detectives to look in his wallet, where they found a rent receipt from Weber dated for Saturday.

After conversing for about an hour in the van, the detectives asked [Hudson] if he would be willing to go over to the community center and make a recorded statement because the pounding rain made it hard to hear and impossible to record [Hudson]'s statements. [Hudson] agreed. Officers indicated that they would have allowed [Hudson] to leave at that time if he had asked to do so. Inside the community center the light was much brighter than it had been outside or in the police van, enabling officers to see bloodstains the size of baseballs on both of [Hudson]'s knees. In addition, [Hudson] removed his jacket once inside the community center and detectives observed a bandage on his arm, which [Hudson] initially tried to cover. Shortly after officers began recording, [Hudson] again asked if he should have an attorney. One of the detectives again told him that it was up to him. [Hudson] responded that he did want an attorney, so officers ended the conversation and took [Hudson] into custody.

Pursuant to the consent search that [Hudson] had signed, another detective began a walk-though of the 62nd Street house at about 3:15 a.m. and observed blood in various areas, including the living room door jamb, the living room carpet, and on the transition strip from the living room to the kitchen. As a result,

detectives froze the scene and left the house until obtaining a search warrant [at] about 9:14 that morning.

*State v. Hudson*, 253 Or. App. 327, 329-34 (2012).

Over the course of three days, law enforcement intensely processed the 62nd Street house and recovered significant physical evidence connecting Hudson to the homicides. The postconviction court summarized that evidence, as follows:

> No signs of forced entry were found, nor were any unaccounted-for fingerprints found. There was nothing to show that intruders had entered the home. In addition, there was nothing missing to suggest that the deaths of Weber and Copeland had occurred during a burglary. Criminalists did determine, though, that major blood-letting events had taken place upstairs in the loft of the home and at the front door entry to the home. DNA evidence was consistent with David Copeland being shot repeatedly while he sat in a recliner chair in the loft. DNA evidence was also consistent with Francis Weber being shot near the front entrance. In addition, it appeared that the bodies had been moved to the backdoor, taken from the home, and later disposed of, where they were found along US 26. Small amounts of [Hudson]'s blood were found in the area of both bloodletting events in the home. In addition, [Hudson]'s jeans, boxer shorts, and a hand towel were three of the items recovered on US 26, from the eastbound lanes, east of where the bodies had been dumped. [Hudson]'s blood was on the jeans, as was the blood of Weber and Copeland. Moreover, [Hudson] had a fresh cut on his left forearm and his blood was found at several points near the driver's seat in Weber's maroon colored van. That van was found parked on a street about 10 blocks from Weber's home; besides [Hudson]'s blood around the driver's area and on the back slider-door, the van also contained Weber's severed limbs as well as Weber's blood, Copeland's blood, and a blood saturated area rug which witnesses testified appeared to be the rug that Weber had had just inside his front door.[4]

(Resp't Ex. 137 at 2-3.) Law enforcement also observed that a bullet had been removed from the wall near the chair where Copeland was shot, and that someone had tried to clean up blood spatter throughout the home, including in the upstairs loft, the front entryway, and the kitchen floor. (Tr. at 3328-53.)

---

[4] Also inside the van was a pink towel bearing Weber's blood that was similar to another towel found in Hudson's bathroom. (Tr. at 3164-66; 3433-34, 3522.)

Hudson proceeded to trial before a jury in the Multnomah County Circuit Court in June 2008, where he was represented by Jane Claus ("Claus") and Steve Lindsey ("Lindsey") (together, "defense team" or "trial counsel").[5] Although the defense team filed several pretrial motions to exclude Hudson's statements to law enforcement and other evidence allegedly obtained in violation of Hudson's Fourth and Fifth Amendment rights, the trial court denied those motions. (Tr. at 528-39.)

During opening statement, the prosecutor outlined the evidence that would be presented, describing in some detail the crime scenes and summarizing the anticipated testimony of the numerous prosecution witnesses slated to testify. (Tr. at 2414-34.) The prosecutor then noted:

> Now, on May 23rd of this year, less than a month ago, the defense filed a notice of intent to rely on a defense of alibi. Now that means, "I wasn't there. I was elsewhere when the crime was committed." Their notice indicates that the defendant was in North Portland and at a bar called Grandma's Table near 41st and Southeast Holgate.

(Tr. at 2434.) The prosecutor commented that because the medical examiner could not determine a specific time of death—which had otherwise been narrowed down to sometime between approximately 4:00 p.m. on Saturday, November 4, when Weber was last seen alive, and early morning Sunday, November 5, when the bodies were found—the alibi, "even if true, is of little value." (*Id.*) Neither Claus nor Lindsey objected to the prosecutor's comment about the timing of the alibi notice.

The prosecutor detailed in his case in chief the physical evidence described above, and also sought to establish that Hudson had the opportunity, means, and motive to murder both

---

[5] Attorneys Forrest Rieke and Christopher Clayhold initially represented Hudson, (Tr. at 111-12), but were replaced by Claus and Lindsey in January 2008. (Resp't Ex. 114 at 2.)

victims. Specifically, the prosecutor elicited evidence that Hudson owned a handgun[6], which he normally kept in a drawer by his bedside, and that Weber and Copeland, Hudson's roommates, both were killed by multiple gunshot wounds. (Tr. at 2973, 3020-21, 3231, 3245, 3386-87.) The prosecutor theorized that Hudson killed Weber because Weber had grown increasingly frustrated with Hudson's failures to timely pay his rent and to abide by the "strict" house rules Weber imposed to keep the house clean and orderly. (Tr. at 2937-39, 2981-85.) To support this theory, the prosecutor elicited evidence that in the days preceding the murders, Weber told friends and family that he would "have to do something" about Hudson's failure to follow the house rules (November 1, 2006), that he was struggling to "figure out how . . . to get Frank Hudson out of the house" (November 3, 2006), and that things were coming to a head and he "need[ed] [Hudson] out" (November 4, 2006). (Tr. at 2938-40, 2973-74, 2988-90.) Weber and Copeland's bodies were then found shortly before 7:45 a.m. on November 5, 2006. (Tr. at 2474.)

In his defense, Hudson testified that he did not kill Weber and Copeland. (Tr. at 3792-93.) Recounting his movements the weekend of the murders, Hudson testified that he cut his arm while on the job at a construction site on Friday, November 3, and then borrowed Weber's van[7] to buy groceries that evening. (Tr. at 3770.) Hudson testified that he got up early on Saturday,

---

[6] Michael Riehl, who briefly rented a room from Weber in 2005, testified that he perceived Hudson's gun to be a .38-caliber Smith & Wesson revolver. (Tr. at 3387.) Law enforcement ultimately determined that the spent bullet recovered from clothing strewn along Highway 26 was a .38-caliber bullet that bore the same markings as the bullets recovered from Weber and Copeland's bodies, indicating that all three were fired from the same gun. (Tr. at 3421-22, 3481-82.) The gun used to kill Copeland and Weber was never found.

[7] Hudson originally told the police that he had last driven Weber's van three or four months prior to the murders. (Tr. at 3025.) In addition, Weber's niece testified that Weber generally did not let other people drive his van, and that she knew of only a single instance when someone other than Weber had driven the van to take Weber home from the hospital after back surgery. (Tr. at 2983.)

November 4, worked at some construction projects, went shopping at target, met a friend for

dinner, and stopped at Safeway before returning home that evening. (Tr. at 3772-76.) Hudson

then went to Grandma's Table and played pool until "10:30 or 11:00" before taking the bus

home and going to bed. (Tr. at 3776-79.) Hudson testified that he was equally busy on Sunday,

November 5, heading to work early and running errands before returning home around 7:30 that

night. (Tr. at 3780-84.) Hudson claimed that he was asleep in bed by the time the police loud

hailed him out of the house. (Tr. at 3784-85.)

      The jury ultimately returned unanimous verdicts convicting Hudson of two counts of

murder, four counts of aggravated murder, and two counts of first-degree abuse of a corpse. (Tr.

at 4141-44.) The jury did not unanimously agree on the special verdicts for imposing the death

penalty, however, and the trial court ultimately sentenced Hudson to life in prison without the

possibility of parole. (Tr. at 4509-11, 4525-27.)

## II.    Direct Appeal

      Hudson directly appealed the trial court's judgment. In his counseled brief, Hudson

assigned as error the trial court's denial of his motions to suppress, arguing that (1) the police

unlawfully seized him when he was "loud hailed" from the house; (2) the police arrested him

without probable cause when they handcuffed him and placed him in the back of a patrol car; (3)

the police violated his rights when they spoke with him before providing *Miranda* warnings; and

(4) the police failed to clarify whether he intended to invoke his right to counsel when he asked if

he needed an attorney. (Resp't Ex. 105 at 27-49.) Hudson also filed a *pro se* supplemental brief,

assigning errors that are not relevant to the instant petition. (Resp't Ex. 108.)

      In a published opinion, the Oregon Court of Appeals determined that the loud hail

constituted a seizure, but that such seizure was lawful because under the totality of the

circumstances, officers had "reasonable suspicion that [Hudson] was involved in a crime" and "exigent circumstances existed to support a warrantless entry into the house." *Hudson*, 253 Or. App. at 339-40. The Court of Appeals further determined that the totality of the circumstances gave the police "probable cause to arrest [Hudson] when they placed him in handcuffs[,]" and that officers' interactions with Hudson before and after he was handcuffed did not constitute an interrogation such as to require *Miranda* warnings. *Id.* at 340, 345-46. Finally, the Court of Appeals determined that "detectives appropriately responded to [Hudson]'s inquiry regarding an attorney, and their subsequent questioning of [him] did not violate his right to counsel." *Id.* at 344-45. The Court of Appeals thus held that "the trial court properly denied defendant's motions to sup[p]ress" and affirmed the trial court's judgment. *Id.* at 346. The Oregon Supreme Court denied review. *State v. Hudson*, 353 Or. 562 (2013).

## III.    Postconviction Proceedings

Hudson next filed a petition for postconviction relief ("PCR"). (Resp't Ex. 113.) In his counseled amended petition,[8] Hudson asserted that his trial attorneys were ineffective in several respects, including when they "failed to offer evidence and argument to explain why petitioner's pants and boxers were found on Highway 26 near where the bodies were found" and "failed to object, move to strike, and request a mistrial after the state mentioned the timing of petitioner's alibi notice in its opening statement[.]" (Resp't Ex. 114 at 5-6.) Hudson alleged that trial counsel's errors, "[w]hether considered cumulatively or individually," were "sufficiently significant to undermine confidence in the outcome" of trial, and that there was "a reasonable

---

[8] Hudson also filed a brief pursuant to *Church v. Gladden*, to "add to [his] attorney's [PCR] petition" the "areas that he decline[ed] to argue" and a revised memorandum alleging ineffective assistance of counsel, "trial court error," "defective indictment," prosecutorial misconduct, and due process violations. (Resp't Exs. 115, 117.)

probability . . . the result would have been different" absent such errors. (*Id.* at 5.) After a hearing during which the parties presented documentary evidence and oral argument, the PCR court issued a written judgment denying relief on each of Hudson's claims. (Resp't Ex. 137.)

Hudson appealed the PCR court's judgment, renewing his claim that his trial attorneys were ineffective in "fail[ing] to offer evidence and argument to explain why [Hudson]'s pants and boxers were found on Highway 26 near where the bodies were found" and failing to object, move for a mistrial, or move to strike after the prosecution "mentioned the timing of [Hudson]'s alibi notice in its opening statement[.]" (Resp't Ex. 138 at 14-15.) The Oregon Court of Appeals affirmed the PCR court's judgment without opinion, *Hudson v. Cain*, 297 Or. App. 810 (2019), and the Oregon Supreme Court denied review, *Hudson v. Cain*, 365 Or. 657 (2019).

## IV.    Federal Habeas Corpus

On January 31, 2020, Hudson filed a Petition for Writ of Habeas Corpus. (ECF No. 2.) In his counseled amended petition,[9] Hudson raises four grounds for relief:

> **Ground I**:     Petitioner's Fifth Amendment privilege against self-incrimination and Sixth Amendment right to counsel were violated by the admission of his statements against him, as set forth below:
>
> 1.     The admission of Petitioner's custodial statements, made without *Miranda* warnings and after the police surrounded Petitioner's house, ordered him outside on a loudspeaker, handcuffed him, and locked him in the back of a patrol car for 20 to 30 minutes violated his Fifth Amendment rights.
>
> 2.     Petitioner's Fifth and Sixth Amendment rights were violated when law enforcement failed to clarify Petitioner's invocation of his right to counsel.
>
> 3.     Petitioner's post-*Miranda* statements were inadmissible because subsequent *Miranda* warnings did not dispel the taint from his unwarned statements.
>
> **Ground II**:     Petitioner was denied effective assistance of counsel in violation of his Sixth and Fourteenth Amendment rights because his trial attorney:

---

[9] On Hudson's motion, this Court appointed the Federal Public Defender to represent Hudson in this action on April 21, 2020. (ECF No. 10.)

1.    Failed to pursue a reasonable theory of defense—including, but not limited to, by conducting an adequate investigation—to explain why Petitioner's clothing was found on U.S. 26 between where the bodies were found and the house where the murders took place and Petitioner rented a room.

2.    Failed to conduct an adequate investigation concerning Petitioner's alibi.

3.    Unreasonably opened the door to evidence of Petitioner's invocation of his right to remain silent.

4.    Failed to object, move to strike, or move for a mistrial following the prosecution's improper argument regarding the timing of the filing of the pre-trial alibi notice.

5.    Failed to object to evidence that blood on Petitioner's pants was that of Petitioner and some person other than the murder victims.

6.    Failed to object to unduly inflammatory arguments by the prosecution concerning the consequences to the community should the jury fail to convict Petitioner.

7.    Failed to perform according to the standards demanded for representation of criminal defendants charged with capital offenses.

**Ground III**:    Petitioner's Fifth and Fourteenth Amendment rights to a fair and impartial jury were violated when the court denied Petitioner's cause challenge to a juror whose wife was closely involved in the Portland Police Bureau's criminal investigation of Petitioner.

**Ground IV**:    Petitioner was denied his due process right to a fair trial, in violation of the Fifth and Fourteenth Amendments, by prosecutorial misconduct in closing argument when the prosecutor improperly exhorted the jury to consider the consequences to the community if the jurors failed to convict Petitioner.

(Am. Pet. at 3-4.) Respondent urges this Court to deny habeas relief, arguing that the state-court decisions denying Ground One and Subparts One and Four of Ground Two are entitled to deference, and that the remainder of Hudson's claims are procedurally defaulted. (Resp. to Pet. (ECF No. 42) at 6-19.) Respondent also argues, in the alternative, that Hudson failed to meet his burden of establishing that he is entitled to habeas relief on all claims except Ground One and Subparts One and Four of Ground Two because he did not advance the merits of those claims in his supporting brief. (Resp't's Reply to Pet'r's Br. (ECF No. 70) at 2-3.)

///

PAGE 12 – OPINION AND ORDER

**DISCUSSION**

I.    **This Court Must Defer to the State-Court Decisions Denying Relief on Ground One and Subparts One and Four of Ground Two**

In Ground One, Hudson renews his claims that the trial court erred by admitting certain pretrial statements that were made before officers gave Hudson *Miranda* warnings and after officers "failed to clarify" Hudson's alleged invocation of his right to counsel. (Am. Pet. at 3.) In Subparts One and Four of Ground Two, Hudson renews his claims that his trial attorneys were ineffective when they failed to "pursue a reasonable theory of defense" to explain why Hudson's clothing was found on the side of the highway between the location of the bodies and the 62nd Street house, and failed to object when the prosecutor referred to the timing of the alibi notice in his opening statement. (*Id.* at 3-4.) Respondent argues that the state-court decisions denying relief on those claims were not objectively unreasonable and are therefore entitled to deference. (Resp. to Pet. at 11-19.) This Court agrees.

A.    **Legal Standard**

The Antiterrorism and Effective Death Penalty Act ("AEDPA") prohibits relitigation of any claim adjudicated on the merits in state court unless such adjudication resulted in a decision that was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d) ("Section 2254(d)"). The AEDPA thus imposes "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (simplified); *see also White v. Wheeler*, 577 U.S. 73, 76-77 (2015) (acknowledging that the "AEDPA, by setting forth necessary predicates before a state-court judgment may be set aside,

erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court") (simplified).

A state-court decision is "contrary to" clearly established federal law if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" of clearly established federal law occurs if the state court correctly identifies the governing legal principle but misapplies that principle to the facts at hand. *See id.* at 407 (holding that "a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case"). The "unreasonable application" clause requires the state court's decision to be more than merely erroneous or incorrect. *See id.* at 411 (noting that "a federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly"). Rather, "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409

A federal habeas court may not disturb a state-court decision on factual grounds unless the state court's decision was based on an unreasonable determination of the facts in light of the evidence before it. 28 U.S.C. § 2254(d)(2). Under the "unreasonable determination" clause, "[t]he question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). The Ninth Circuit has clarified that when a petitioner

challenges the substance of a state court's findings, the federal habeas court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir.), *cert denied*, 543 U.S. 1038 (2004). "The petitioner carries the burden of proof." *Pinholster*, 563 U.S. at 181.

## B.    Analysis

### 1.    Ground One

In Ground One, Hudson claims that the admission of his post-arrest statements to law enforcement violated his Fifth and Sixth Amendment rights. (Am. Pet. at 3.) In his supporting brief, Hudson develops only two aspects of this claim, arguing that the statements he made after being loud hailed out of the house and after asking if he needed an attorney should have been excluded.[10] (Pet'r's Br. (ECF No. 66) at 33-37.) This Court addresses Hudson's arguments in turn.

#### a.    Any Error in Admitting Hudson's Statements to Defrain was Harmless

Hudson asserts that the admission of his "custodial statements, made without *Miranda* warnings and after the police surrounded [his] house, ordered him outside on a loudspeaker, [and] handcuffed him . . . violated his Fifth Amendment rights." (Am. Pet. at 3.) Specifically, Hudson argues that immediately after he was loud hailed out of the house, Defrain improperly "interrogated" him by asking his name and other "investigative" questions without first advising him of his *Miranda* rights. (Pet'r's Br. at 33-35.)

---

[10] To the extent Hudson seeks to challenge any aspect of Ground One other than those addressed here, he has not proven that the Oregon Court of Appeals' resolution of those issues was contrary to or an unreasonable application of federal law.

The Oregon Court of Appeals rejected a similar claim on direct appeal,[11] explaining:

[W]ith respect to Defrain's interaction with [Hudson] before putting him in the police car, we conclude that the question regarding [Hudson]'s name was not interrogation. Officers did not know who [Hudson] was, only that he had been inside the house but did not match the description of the third roommate who lived there. Asking [Hudson] his name was not a question likely to elicit incriminating evidence and was therefore permissible. In any event, with respect [to] that question as well as Defrain's other two inquiries—whether there was anyone else inside the house and what [Hudson] had been doing at the front door of the house—even assuming those questions did constitute impermissible interrogation and it was error to admit the statements, any error in admitting [Hudson]'s responses was harmless. In other words, there was little likelihood that any error affected the verdict. *See* Or. Const., Art. VII (Amended), § 3[[12]]; *State v. Davis*, 336 Or. 19, 32, 77 P.3d 1111 (2003). In response to the questions at issue, [Hudson] informed officers that [] his name was Frank, that his roommates were not at home, and that he had locked the front door because "Francis would kill him" if he failed to do so. Those statements were not particularly incriminating and, in view of the evidence presented at trial, were unimportant. At trial, the state presented significant DNA evidence, which was found in the residence, Weber's van, and in the clothing and debris that had been scattered along the highway, linking [Hudson] to the homicides. In view of that and all the other evidence presented to the jury, defendant's responses to Defrain had no likelihood of affecting the verdict.

*Hudson*, 253 Or. App. at 346.

Respondent does not challenge Hudson's contention that Defrain's questioning constituted improper "interrogation" in violation of Hudson's *Miranda* rights. That issue therefore is uncontested, and this Court, like the Oregon Court of Appeals, shall assume that it was

---

[11] Because the Oregon Supreme Court denied review, this Court must look to the last reasoned decision on the issue, i.e., the Oregon Court of Appeals' decision affirming the trial court's denial of Hudson's motions to suppress. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

[12] As relevant here, Article VII (Amended), Section 3 of the Oregon Constitution provides:

If the supreme court shall be of opinion, after consideration of all the matters thus submitted, that the judgment of the court appealed from was such as should have been rendered in the case, such judgment shall be affirmed, notwithstanding any error committed during the trail[.]

constitutional error to admit Hudson's responses and proceed directly to the question of prejudice. *See Ruff v. Kincheloe*, 843 F.2d 1240, 1241-42 (9th Cir. 1988) (proceeding directly to harmless error analysis where the respondent conceded error in jury instruction); *Nguyen v. McGrath*, 323 F. Supp. 2d 1007, 1016 (N.D. Cal. 2004) (proceeding directly to harmless error analysis where the respondent conceded a *Miranda* violation).

To establish prejudice, a habeas petitioner must "show the error had a substantial and injurious effect or influence on the verdict." *Brecht v. Abrahamson*, 507 U.S. 619 (1993). This standard is satisfied when the federal habeas court harbors "grave doubt" as to the harmlessness of the error. *See O'Neal v. McAninch*, 513 U.S. 432, 437 (1995) (concluding that where there is "grave doubt as to harmlessness the petitioner must win").

The *Brecht* standard is "more deferential to the state court than the *Chapman* [*v. California*, 386 U.S. 18 (1967)] analysis required for direct review[,] . . . which asks whether the error has been proven harmless beyond a reasonable doubt." *Cudjo v. Ayers*, 698 F.3d 752, 768 (9th Cir. 2012); *see also Sherman v. Gittere*, 92 F.4th 868, 881 (9th Cir. 2024) (explaining that "[a] federal constitutional error can be harmless only if a court is able to declare a belief that it was harmless beyond a reasonable doubt" (quoting *Chapman*, 386 U.S. at 24)). A state court's application of the *Chapman* harmless error standard therefore "qualifies as an adjudication on the merits under AEDPA[,]" *Brown v. Davenport*, 596 U.S. 118, 127 (2022), which may not be overturned "unless that court applied *Chapman* in an objectively unreasonable manner[,]" *Davis v. Ayala*, 576 U.S. 257, 269 (2015). Thus, where a state court has determined a constitutional error to be harmless beyond a reasonable doubt under *Chapman*, "a federal court cannot grant relief without first applying both the test [the Supreme] Court outlined in *Brecht* and the one Congress prescribed in AEDPA." *Davenport*, 596 U.S. at 122.

PAGE 17 – OPINION AND ORDER

Hudson does not address the issue of prejudice in his supporting brief, but Respondent argues that this Court must defer to the Oregon Court of Appeals' determination that the admission of Hudson's statements was harmless. (Resp't Reply (ECF No. 70) at 3.) However, the Court of Appeals did not expressly find harmlessness "beyond a reasonable doubt," cite to *Chapman* in its opinion, or cite any authorities employing *Chapman*'s harmless-error standard. Instead, it applied a state-law test requiring a reviewing court to "ask whether there was little likelihood that the error affected the jury's verdict." *Davis*, 336 Or. at 32. The degree to which the Oregon standard is akin to *Chapman* is unclear,[13] and this Court cannot readily parse the quantum of difference between the two standards to determine whether AEDPA deference is required as Respondent suggests. *See Cudjo*, 698 F.3d at 768-69 (concluding that no AEDPA deference was owed to the California Supreme Court's harmless error determination because it applied a "less demanding state law test"—which provided that "there was no prejudice if it did not appear reasonably probable that the verdict was affected"—that was "contrary to" *Chapman*).

In any event, whether AEDPA applies ultimately is not determinative here because Hudson makes no showing that the admission of his responses to Defrain's questions had any effect on the verdict, much less a "substantial and injurious" effect as would satisfy *Brecht*. *See Davenport*, 596 U.S. at 134 (explaining that "a federal court must *deny* relief to a state habeas petitioner who fails to satisfy <u>either</u> [the Supreme] Court's equitable precedents or AEDPA" (underline added)). As the Court of Appeals noted, the statements admitted—that Hudson's

---

[13] It appears the Oregon Supreme Court may have originally modeled this standard on *Chapman*'s dicta rather than its express holding. *See State v. McLean*, 255 Or. 464, 479 n.6 (1970).

name was Frank, that his roommates were not home, and that he had locked the door because

"Francis would kill him" if he failed to do so—were "not particularly incriminating" and rather

"unimportant" in light of the compelling DNA evidence recovered from the house, Weber's van,

and the clothing recovered from Highway 26 that inextricably linked Hudson to the murders.

Hudson therefore has not proven prejudice from the alleged error, and he is not entitled to habeas

relief on this portion of Ground One.

> **b.    The Oregon Court of Appeals Reasonably Concluded that the Statements Hudson Made After He Asked if He Needed an Attorney were Admissible**

Hudson asserts that detectives violated his Fifth and Sixth Amendment rights by

"fail[ing] to clarify [his] invocation of his right to counsel" when he asked whether he needed an

attorney at the beginning of their encounter inside the police van. (Am. Pet. at 3.) Hudson thus

argues that any statements he made after that invocation should have been excluded, and that he

was prejudiced because "the State used the statements to his detriment at trial." (Pet'r's Br. at 36-

37.)

The Oregon Court of Appeals rejected a similar claim on direct appeal, concluding that,

even if "the question did indeed constitute an equivocal invocation of the right to counsel," the

detectives "responded appropriately and [Hudson] subsequently agreed to speak with [them]."

*Hudson*, 253 Or. App. at 344.*Id.* The Court of Appeals explained:

> [W]hen [Hudson] asked whether he need an attorney, the detective informed him
> that "that was up to him." In other words, he indicated that [Hudson] could make
> the decision whether to have an attorney or not. Furthermore, the detective
> immediately followed that statement by informing [Hudson] of his *Miranda* rights
> both orally and in writing. As part of that advice of rights, the detective informed
> [Hudson] that he had the right to call an attorney. After stating that he understood
> his rights, [Hudson] agreed to speak with detectives. Under those circumstances,
> detectives appropriately responded to [Hudson]'s inquiry regarding an attorney,
> and their subsequent questioning of [Hudson] did not violate his right to counsel.

*Id.*

It is well established that "a suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning[.]" *Davis v. United States*, 512 U.S. 452, 457 (1994) (citing *Miranda v. Arizona*, 384 U.S. 436, 469-73 (1966)). Thus, once an accused has "expressed his desire to deal with the police only through counsel," he may not be "subject to further interrogation by the authorities until counsel has been available to him[.]" *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). However, the request for counsel must be unambiguous. *Davis*, 512 U.S. at 459; *see also McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991) (explaining that invoking the *Miranda* right to counsel requires, "at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney"). "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, [Supreme Court] precedents do not require the cessation of questioning." *Davis*, 512 U.S. at 459; *see also Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) (explaining that "[i]f an accused makes a statement concerning the right to counsel that is ambiguous or equivocal or makes no statement, the police are not required to end the interrogation . . . or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights" (simplified)).

The Oregon Court of Appeals reasonably determined that Hudson's inquiry constituted an equivocal or ambiguous question concerning the right to counsel. Hudson asked if he needed an attorney after detectives informed him that they needed to speak with him, that they were concerned his roommates had been victims of foul play, and that they needed his permission to search the 62nd Street house, which he gave. *Hudson*, 253 Or. App. at 333. Although Hudson

insists that his question "constituted a politely phrased, unequivocal request for counsel," a reasonable officer would not necessarily have understood it as such under the circumstances, *see United States. v. Doe*, 170 F.3d 1162, 1166 (9th Cir. 1999) (concluding that the defendant's question, "What time will I see a lawyer?" was "an inquiry regarding the time at which appointed counsel would be made available" rather than an unequivocal invocation of his right to counsel); *see also United States. v. Younger*, 398 F.3d 1179, 1187 (9th Cir. 2005) (concluding that the question, "But, excuse me, if I am right, I can have a lawyer present through all this, right?" did not constitute an unambiguous invocation of the right to counsel), and the detectives therefore were not required to cease questioning, *Davis*, 512 U.S. at 459. Nevertheless, the detectives advised Hudson that it was up to him—*i.e.*, that it was his decision whether to have an attorney present—and immediately informed him of his *Miranda* rights, both orally and in writing, before engaging in further questioning. Given these circumstances, and in the absence of any clearly established Supreme Court precedent to the contrary, this Court cannot conclude that the Oregon Court of Appeals unreasonably applied federal law to resolve this portion of Ground One. *See Perridon v. Roe*, 408 F. App'x 115, 116-17 (9th Cir. 2011) (finding it was not objectively unreasonable for the state court "to conclude that because petitioner did not unequivocally invoke his right to counsel, the police were not required to end questioning"). Accordingly, Hudson is not entitled to habeas relief on Ground One.

## 2.    Ground Two, Subparts One and Four

In Ground Two, Hudson alleges that his trial attorneys were ineffective in numerous respects. (Am. Pet. at 3-4.) To prevail on an ineffective assistance of counsel claim, a habeas petitioner must satisfy a two-part test. First, the petitioner must establish that counsel's performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466

U.S. 668, 686 (1984). Such a showing requires the petitioner to overcome a strong presumption that the challenged conduct falls within the "wide range of reasonable professional assistance; that is the [petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689.

Second, a petitioner must demonstrate prejudice: "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.* Therefore, it is not enough if counsel's errors had only "some conceivable effect on the outcome of the proceeding." *Id.* at 693. Counsel's errors must have been "so serious as to deprive [the petitioner] of a fair trial, a trial whose result is reliable." *Id.* In making the prejudice determination, the Court must "consider the totality of the evidence before the judge or jury." *Id.* at 695.

Analyzing an ineffective assistance of counsel claim under AEDPA is "all the more difficult" because both standards are "highly deferential and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (citations omitted). Accordingly, when considering an ineffective assistance claim under AEDPA, the relevant question "is not whether counsel's actions were reasonable[,]" but "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

In his supporting brief, Hudson advances only Subparts One and Four of Ground Two, which allege that trial counsel was ineffective in "[f]ailing to pursue a reasonable theory of defense—including, but not limited to, by conducting an adequate investigation—to explain why [Hudson]'s clothing was found on U.S. 26" and "[f]ailed to object, move to strike, or move for a mistrial following the prosecution's improper argument regarding the timing of the filing of the

pre-trial alibi notice." (Am. Pet at 3-4.) Respondent argues that the PCR court's decision denying

relief on those claims is entitled to deference. (Resp. at 14-19.) This Court addresses each claim in

turn.

> **a.    The PCR Court Reasonably Concluded that Trial Counsel was not Ineffective in Failing to Explain why Hudson's Clothing was on Highway 26**

In Ground Two, Subpart One, Hudson alleges that trial counsel was constitutionally

ineffective by failing to investigate or explain why Hudson's clothing was found on Highway 26

between the location of the bodies and the 62nd Street house. (Am. Pet. at 3.) Hudson argues that

"any reasonable defense attorney would have recognized that the bloody clothing on Highway 26

was a problem that needed to be squarely addressed," and that failing to do so "undermined" his

alibi defense. (Pet'r's Br. at 23.) Hudson thus insists that "there is a reasonable probability" trial

counsel's "deficient omission" prejudiced him at trial. (*Id.* at 25-27.)

Hudson presented an identical claim during his PCR proceedings, arguing that had trial

counsel explained why Hudson's clothing was found on Highway 26, such an explanation

"would have had a tendency to yield an acquittal." (Resp't Ex. 117 at 26.) Hudson addressed this

and other claims in a deposition and signed a declaration in support.

During his deposition, Hudson testified that he "usually" spent Friday nights "sleeping on

the couch watching TV in the loft room[,]" and that he would "[t]ake off [his] jeans [and his]

briefs, lay them on the floor, [and] sleep[] in [his] robe." (Resp't Ex. 119 at 33.) Hudson attested

that if asked, he would have testified at trial that he had followed this ritual when he returned

home on Friday, November 3, 2006, and that he left his pants and boxers in the loft when he

went to work the next morning. (Resp't Ex. 121 ¶ 2.) Hudson opined that "[w]hoever . . . killed"

Copeland and Weber had "probably" used his discarded clothing to "clean up the entire area"

before taking the bodies and his clothing from the 62nd Street house and dumping them along

Highway 26.[14] (*Id.* at 33-34.) Hudson attested that although it was "not in the transcript, the

presiding juror remarked after the jury rendered its trial phase verdict that it convicted [him]

because [he] did not explain how [his] pants came to be on Highway 26 near where the bodies

were recovered." (Resp't Ex. 121 ¶ 3.)

       Lindsey responded to Hudson's claims in a separate deposition, acknowledging that the

presence of Hudson's clothing on Highway 26 was a "bad fact" for the defense. (Resp't Ex. 120

at 52.) Lindsey explained, however, that because the defense theory at trial "was that Mr.

Hudson . . . had no involvement in the transport of the bodies [or] the homicides of Mr. Weber

and Mr. Copeland," there would be "no explanation [Hudson] could offer as to . . . how his pants

and clothing and boxers end[ed] up in the van . . . blood soaked and out on the highway." (Resp't

Ex. 120 at 25.) Lindsey testified that he did not recall Hudson telling the defense team that he

had discarded his clothing in the upstairs loft the day before the murders, but that even if he had,

Hudson would have lacked personal knowledge as to what happened to his clothing after he left

it in the loft and would not have been allowed to offer such speculation on the stand at trial. (*Id.*

at 27-28.) Lindsey thus testified that the defense team "had no evidence" to explain why

Hudson's clothes were on Highway 26, and that he could not have presented Hudson's

explanation during closing argument "without drawing an objection from the opposing counsel,

or even a judge saying those are not facts in evidence." (*Id* at 28.) Despite Hudson's claim to the

---

[14] During his deposition, Hudson speculated that "Mexicans" had invaded the 62nd Street house, killed Weber and Copeland, and then drove their bodies many miles west on Highway 26 before dumping the bodies and driving back to Portland, discarding Hudson's pants and boxers along the way. (Resp't Ex. 119 at 30-37.)

contrary, Lindsey testified that none of the jurors offered any explanation as to why they thought Hudson was guilty.[15] (*Id.* at 51.)

Claus also was deposed in response to Hudson's claims. Claus testified that although Hudson told the defense team "multiple stories" about what may have happened to Copeland and Weber, he had not suggested a plausible explanation for how his clothing ended up on Highway 26. (Resp't Ex. 122 at 67-68.) Claus explained:

> [Hudson] surmised that the killer probably threw [his clothing] out there in order to frame him. There was no explanation that we had why his pants and boxers were on the highway. And when Mr. Hudson testified, I believe he – when asked that question by the State, he put his hands up and shrugged like, "I don't know." We could not find a reasonable explanation, from our investigation.

(*Id.* at 33.) Although Claus later testified that Hudson "may have said" that he would sometimes "fall asleep or pass out watching TV and leave his clothes in the common area," she could not recall Hudson claiming to have done so before the murders or suggesting that his clothing could have been "scooped up" by the killer as he or she moved the bodies. (*Id.* at 33-34, 67, 70.)

After an evidentiary hearing, the PCR court concluded that Hudson "failed to prove that his attorneys were ineffective for failing to offer evidence and argument to explain how [Hudson]'s pants and underwear could have gotten to the location where the bodies were found." (Resp't Ex. 137 at 5.) The PCR court explained:

> [T]here is no credible evidence that [Hudson] ever told his trial attorneys that he had a habit of taking off his pants and underwear in the room where one of the murders occurred. His attorneys do not recall [Hudson] ever telling them about such a habit. [Hudson]'s recollection of this habit appears to be of recent origin. Even if [Hudson] left his pants and shorts in the TV room as he now claims, there is no evidence to support how they got from the home to the location of the bodies. Trial attorneys never had any evidence to support making an argument

---

[15] Claus also testified that the jury never explained or commented on its verdict. (Resp't Ex. 122 at 72.)

about a theory of how [Hudson]'s pants and underwear arrived at the location of the bodies.

(Resp't Ex. 137 at 5.) The PCR court also determined that Hudson failed to prove prejudice, stating:

> [Hudson] has not proved that had he testified about his habit of disrobing in the TV room and his attorneys had argued his new theory, that it would have had a tendency to affect the outcome of the trial. Even if [Hudson] testified about his habit of leaving clothes about the house, his theory of how the clothes got to the location of the bodies many miles away would have been speculation at best and would have been contrary to the evidence that the killer went to great lengths to clean up the scene of the murders in the home. [Hudson]'s claim that he heard a juror indicate that the jury convicted [him] because there was no explanation for [Hudson]'s clothes being at the scene where the bodies were found is not credible. Neither of his attorneys who were in the courtroom at the time heard such a comment.

(*Id.*)

The PCR court's decision was not objectively unreasonable.[16] As the PCR court explained, there simply was no evidence "to support making an argument about a theory of how [Hudson]'s pants and underwear arrived at the location of the bodies." (*Id.*) Neither Claus nor Lindsey could recall with certainty that Hudson told them about his alleged Friday night ritual of disrobing and sleeping in the loft,[17] and Claus confirmed that the defense team's investigation otherwise failed to yield a "reasonable" explanation for why Hudson's clothing was found near the bodies of his brutally murdered roommates many miles away from the house they shared.

---

[16] Because the Oregon Court of Appeals affirmed without opinion, and the Oregon Supreme Court denied review, this Court looks through to the PCR court's written judgment denying relief, the last reasoned decision on the issue.

[17] As noted above, there appears to have been some confusion as to what Claus could recall with respect to Hudson's alleged habit of disrobing and sleeping in the loft. However, even assuming Hudson told Claus that he normally spent Friday nights watching TV in the loft in various stages of undress, Hudson still has not shown that the PCR court unreasonably determined that he failed to prove prejudice.

(Resp't Exs. 120 at 27-28, 122 at 33.) Indeed, Hudson appears to fault his attorneys for failing to

investigate and present a theory that is based solely on Hudson's own self-serving testimony

after the fact. *Cf. Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000) (affirming district court's

conclusion that the petitioner failed to provide sufficient evidence to prove his attorney was

ineffective for failing to interview or call an alleged alibi witness because there was "no evidence

in the record that this witness actually exists, other than from [the petitioner]'s self-serving

affidavit" and "no evidence that this witness would have provided helpful testimony for the

defense"); *Lopez v. Williams*, No. 2:18-cv-00480-JCM-NJK, 2021 WL 2652322, at *9 (D. Nev.

June 28, 2021) (concluding that defense counsel was not ineffective for failing to investigate

"evidence of other suspects who had allegedly been committing robberies in the area" because

the petitioner "presented . . . nothing other than his self-serving statement in support of his

contention that police had evidence of other suspects").

Furthermore, the PCR court reasonably found that Hudson failed to prove prejudice.

Hudson's theory that the "real killer" simply scooped up his discarded clothing when moving the

bodies was entirely speculative and contrary to other evidence in the record. There was no

evidence of forced entry or burglary and, in any event, it is highly implausible that another killer

(or killers) would have come in and murdered Copeland and Weber before then cleaning several

areas of the house, removing a spent bullet from the wall, planting a spent bullet in the pocket of

Hudson's jeans, loading up the bodies and Hudson's clothing in Weber's van, dumping the

bodies over thirty miles away, and throwing Hudson's clothing on the side of the highway during

the return trip to southeast Portland, where they parked the van ten blocks away from the 62nd

Street house. Hudson's arguments notwithstanding, this Court cannot conclude on this record

that the PCR court's decision denying relief was "so lacking in justification that there was an

error well understood and comprehended in existing law beyond any possibility for fairminded

disagreement[,]" *Richter*, 562 U.S. at 103, and its decision denying Hudson's claim is entitled to

deference. Accordingly, Hudson is not entitled to habeas relief on Ground Two, Subpart One.

> ### iii.    The PCR Court Reasonably Concluded that Trial Counsel was not Ineffective in Failing to Object to the Prosecutor's Reference to the Timing of the Alibi Notice During his Opening Statement

In Ground Two, Subpart Four, Hudson alleges that trial counsel was constitutionally

ineffective in failing to object, move to strike, or move for a mistrial after the prosecutor

referenced the timing of the pre-trial alibi notice during his opening statement. (Am. Pet. at 3-4.)

Hudson argues that trial counsel had a duty to object because the reference was irrelevant,

prejudicial, and suggested that his alibi "had been contrived recently and was false." (Pet'r's Br.

27-32.) Hudson thus claims that "there is a reasonable probability that the outcome of his trial

would have been different" if trial counsel had objected. (*Id.* at 32.)

Hudson advanced a similar claim during his PCR proceedings, arguing that "[t]he timing

of petitioner's alibi notice was inadmissible and extremely prejudicial." Specifically, Hudson

argued that trial counsel's failure to object "reinforced the prosecution's argument that

[Hudson]'s alibi was fabricated" and "substantially diminished the effectiveness of [Hudson]'s

defense[.]" Hudson thus argued that trial counsel's failure to object "had a tendency to affect the

outcome of the proceeding." (Resp't Ex. 117 at 34.)

In response, Lindsey and Claus both testified that because Hudson faced a potential death

sentence, the defense team's "primary objective . . . was to save his life." (Resp't Ex. 127 ¶ 4;

*see also* Resp't Ex. 122 at 49-51.) Lindsey explained that one strategy the defense team used to

accomplish this was "to be respectful to the Court and all concerned, to earn the trust of the

jurors, and to be perceived as credible advocates." (Resp't Ex. 127 ¶ 4.) Lindsey thus attested

that neither he nor his co-counsel would have objected or moved for a mistrial when the

prosecutor referenced in his opening statement the timing of Hudson's alibi notice, explaining:

> Ms. Claus and I were happy with the jury we had. We felt that voir dire had gone very well and that we had about the best chance possible of getting jurors who would be reluctant to impose a death sentence.[18] [The prosecutor]'s reference to the alibi in opening was not a big concern to me, certainly not enough to cause me to ask for mistrial and lose the good work of the jury selection. I also would not have objected and moved to strike at such an early stage of the proceedings. Again, co-counsel and I were thinking with a long-term perspective. We did not want the jury to perceive us as obstructionist. We knew that we would be putting Mr. Hudson and other witnesses on the stand to testify in support of his alibi defense. To object in opening statement, because the prosecutor had said we had only recently filed an alibi notice, might have been annoying to the jury. It certainly would have drawn attention to a point that I thought was best ignored.

(Resp't Ex. 127 ¶ 5.)

The PCR court ultimately concluded that trial counsel acted reasonably by not objecting

or moving for a mistrial, and that Hudson was not prejudiced. The PCR court explained:

> [Hudson] has failed to prove that his trial attorneys were ineffective for failing to object and move for a mistrial when the District Attorney mentioned in opening statement that [Hudson] had only recently filed a notice of alibi. There is no Oregon case law on this issue but there are out-of-state authorities for the proposition that a prosecutor may not mention or attack an alibi defense until the defendant actually put on evidence to raise[] the issue at trial. Trial counsel is not ineffective for not raising an issue that had not been addressed in the Oregon courts. Trial counsel did not feel the comment was important because he intended to proceed with the alibi defense and put on evidence to support it. Further, [Hudson] had written letters while in jail stating that he was innocent and that he was not at the home at the time of the murders. There is no evidence that a motion

---

[18] Claus testified that the defense used the "Colorado method" to select the jury. (Resp't Ex. 122 at 49.) Claus explained that under the Colorado method, the defense team "score[d] jurors from 1 to 7[,] [o]ne being that they would refuse to give a death penalty in any circumstance; 7 being an automatic death penalty." (*Id.*) Claus testified that they ultimately seated a jury with no one scored above a 4, meaning the defense "had a jury of, essentially, life givers[,]" and that "studies have . . . shown . . . that people who are more likely to grant a life sentence are also more likely to vote for an acquittal[.]" (*Id.* at 49-50.) Claus noted that the National College of Capital *Voir Dire* has since used the transcript of their *voir dire* in Hudson's case to teach the Colorado method, and that the transcript also has been used at death penalty conferences to demonstrate the successful use of the Colorado method in practice. (*Id.*)

for a mistrial would have been granted. If granted, a motion for a mistrial would
have caused the trial to begin again with a different jury. [Hudson] has not proven
that every reasonable attorney would have objected and moved for a mistrial
under the circumstances.

[Hudson] has also failed to prove prejudice. Because [Hudson] did testify about
his alibi and did produce witnesses in an effort to support that alibi, the comment
did not impact his right to remain silent. Because [Hudson] had written [a] letter
[to the prosecutor] proclaiming his innocence without mentioning an alibi, the
Prosecutor properly mentioned that the alibi defense appeared to be o[f] recent
vintage. Had trial counsel moved for a mistrial and had the motion been granted,
[Hudson] would have lost the jury that had been selected which did not impose
the death penalty despite the very gruesome and horrific nature of the double
murder. Another jury may have been more willing to impose the death penalty.
[Hudson] did not prove that the failure to object and move for a mistrial had a
tendency to affect the outcome of the trial.

(Resp't Ex. 137 at 6.)

The PCR court's decision was not objectively unreasonable. As an initial matter, the PCR

court specifically determined that the prosecutor's reference to the alibi notice in his opening

statement did not impact Hudson's right to remain silent, and that trial counsel was not

ineffective for failing to object because there was no Oregon caselaw on the issue. This Court

may not second-guess the PCR court's interpretation and application of state law. *See Estelle v.*

*McGuire*, 502 U.S. 62, 67-68 (1991) (emphasizing that "it is not the province of a federal habeas

court to reexamine state-court determinations on state-law questions").

In addition, Claus and Lindsey testified that the defense team's primary goal was to save

Hudson's life, and one way they sought to accomplish that goal was by being courteous,

objecting only when necessary, and establishing themselves as credible advocates in the eyes of

the jury. (Resp't Exs. 122 at 49-51, 127 ¶ 4.) Although Lindsey acknowledged in his deposition

that he viewed the prosecutor's comment as a "cheap shot" toward the defense, he testified that

at the time, he worried that more prejudice would result if the jury witnessed the defense and the

prosecution bickering and "fight[ing] over the littlest of details" than if he let the prosecutor's

PAGE 30 – OPINION AND ORDER

reference to the timing of the alibi notice go without comment. (Resp't Ex. 120 at 48-50) Lindsey further testified that in any event, he did not think that the prosecutor "was making [a] powerful impression [on] the jury everytime he spoke" and that, in his judgment, the prosecutor's comment "wasn't something that deserved an objection under the evidence code." (*Id.* at 30.)

Moreover, Claus and Lindsey both testified that they were happy with the jury they had assembled and rightly felt that there was a good chance they had selected "life giving" jurors who would be reluctant to impose the death penalty. (Resp't Exs. 122 49-51, 127 ¶ 5.) Had either moved for a mistrial and that motion been granted, the defense would have lost the jury that ultimately spared Hudson's life and, as the PCR court noted, it is far from certain that a different jury would have done so. Given those circumstances, the PCR court reasonably concluded that Hudson failed to prove that his attorneys were ineffective in failing to object to the prosecutor's reference to the timing of Hudson's alibi notice or that he was prejudiced by such failure. *See United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993) (explaining that "[b]ecause many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the wide range of permissible professional legal conduct" (simplified)); *see also Cunningham v. Wong*, 704 F.3d 1143, 1159 (9th Cir. 2013) (finding that failure to object to the prosecutor's comments, "possibly to avoid highlighting them, was a reasonable strategic decision").

Hudson nevertheless insists that trial counsel had a duty to object because the prosecutor's argument was irrelevant and invited jurors to consider evidence outside the record. Even assuming trial counsel was deficient for failing to object, however, the trial court warned

the jury that "[t]he opening statement and closing arguments of the lawyers . . . are not evidence" and that they are "not to consider" those arguments in deciding the case. (Tr. at 2391.) The jury is presumed to have followed those instructions. Therefore, based on the significant inculpatory evidence presented, there is no reasonable probability that the result of trial would have been different if trial counsel had raised an objection to the prosecutor's comment about the timing of the alibi notice in his opening statement. *Cf. Featherstone v. Estelle*, 948 F.2d 1497, 1507 (9th Cir. 1991) (finding counsel's failure to object to a "manifestly improper" argument during closing argument did not prejudice the petitioner where other evidence of his guilt was substantial, and the trial court instructed the jury that counsel's statements were not evidence).

For these reasons, the PCR court did not unreasonably apply *Strickland* or make unreasonable factual determinations in denying Hudson's ineffectiveness claim, and that decision is entitled to deference. This Court thus denies habeas relief as to Ground Two, Subpart Four.

## II.    Hudson is not Entitled to Habeas Relief on his Unargued Claims

In his supporting brief, Hudson does not provide any legal argument in support of Grounds Three, Four, and Subparts Two, Three, and Five through Seven of Ground Two, and concedes Respondent's argument that those claims are procedurally defaulted. (Pet'r's Br. at 19.) Accordingly, habeas relief is precluded on those grounds because they are procedurally defaulted, and because Hudson has failed to sustain his burden of demonstrating why he is entitled to habeas relief on those claims. *See Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (recognizing that a habeas petitioner carries the burden of proving his case). Nevertheless, the Court has reviewed those claims and is satisfied that Hudson is not entitled to habeas corpus relief.

PAGE 32 – OPINION AND ORDER

## <u>CONCLUSION</u>

For the reasons stated, this Court DENIES the Amended Petition for Writ of Habeas Corpus (ECF No. 42), and DISMISSES this proceeding, with prejudice. Petitioner has not made a substantial showing of the denial of a constitutional right, and therefore this Court DENIES a Certificate of Appealability. *See* 28 U.S.C. § 2253(c)(2).

**IT IS SO ORDERED.**

DATED this __1st__ day of May, 2025.

*Karin J. Immergut*
Karin J. Immergut
United States District Judge